UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARVIN SIMS, individually and MARVIN SIMS d.b.a. MODERN SEWER CONSTRUCTION COMPANY, INC., a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>COLONY INSURANCE COMPANY, a Virginia Limited Liability Company,<br><br>Defendant. | CASE NO. C03-0749C<br><br>ORDER |

I.   INTRODUCTION

This matter has come before the Court on Defendant's motion for summary judgment (Dkt. No. 29) and Plaintiffs' motion for a Rule 56(f) continuance (Dkt. No. 31), as well as an assortment of surreply and supplemental papers filed by the parties. Having carefully considered the papers filed by the parties in support of and in opposition to the motions, the Court has determined that no oral argument shall be necessary. For the reasons that follow, Plaintiffs' motion for a Rule 56(f) continuance is DENIED, and Defendant's motion for summary judgment is GRANTED.

ORDER – 1

## II. BACKGROUND

This lawsuit arises out of an insurance policy, called a Storage Tank Pollution Liability Claims Made and Reported Policy ("STPL Policy"), issued by Defendant Colony Insurance to Plaintiff Marvin Sims d.b.a. Modern Sewer Construction Company ("Modern Sewer"). The policy was effective between February 13, 1998, and February 13, 1999, and covered two underground storage tank ("UST") systems located on Plaintiffs' property in Mukilteo, Washington. The covered systems included a 4,000-gallon diesel tank and a 6,000-gallon diesel tank which held gasoline and diesel fuel for the trucks used by Modern Sewer in its construction business.

The policy obligated Defendant to "pay on behalf of [Modern Sewer] all Third Party Damages . . . that [Modern Sewer] shall be obligated to pay which are caused by a Release of a Petroleum Product from a Scheduled Facility" and to "pay . . . all reasonable and necessary Corrective Action Costs . . . arising out of a Release." (Dkt. No. 33, Land Decl. Ex. 1 ("Policy") at 1.) The policy further provided that Defendant had "the right and duty to defend [Modern Sewer] against any suit, arbitration, or other proceeding asserting Claims for Third Party Damages against [Modern Sewer] or seeing to compel [Modern Sewer] to pay Corrective Action Costs." (*Id*. at 2.) "Release" was further defined as "sudden or accidental or gradual spilling, leaking, emitting, discharging, escaping, or leaching from a Storage Tank System at a Scheduled Facility." (*Id*. at 3.) "Storage Tank System" was defined, in part, as "[a]n underground storage tank or combination of tanks and associated piping, including any attached dispenser(s), that is used to contain an accumulation of regulated substances." (*Id*. at 4.)

Near the end of March 1998, Nelson Distributing, Inc., a commercial provider of bulk petroleum products, mistakenly pumped 2,000 gallons of gasoline into a section of PVC pipe[1] not connected to a tank. A few days later, on April 1, 1999, Modern Sewer discovered that its tanks were still empty,

---

[1] The parties are in disagreement as to how this PVC pipe should be characterized, *i.e.*, as "monitoring wells" required by Washington law to be part of all underground storage tanks, or as "simply sections of pipe having no purpose relating to groundwater sampling or measurement."

ORDER – 2

despite the recent delivery.  The next day, the Nelson driver admitted that he had unintentionally pumped the gasoline well into the PVC pipe.  (Compl. ¶ 19.)  As a result, on April 4, 1998, Nelson Distributing delivered another 2,000 gallons to Modern Sewer free of charge.  Shortly after this delivery incident, Modern Sewer "received a complaint from a downhill tenant about gasoline smell.  An investigation into this complaint uncovered a large amount of gasoline in the surface water drain system."  *Modern Sewer Corp. v. Nelson Distributing, Inc.*, 109 P.3d 11, 12 (Wash. Ct. App. 2005).

In January 2000, Plaintiffs decommissioned the tanks and had them removed by Creative Environmental Technologies, Inc. ("CETI").  CETI prepared a UST Site Assessment report for Modern Sewer's president, Kirk Weinz.  (*See* Dkt. No. 30, Adams Decl. at 11-13, excerpt of report ("CETI Report").)  In the report, CETI noted that

> [a]ccording to Kirk Weinz . . . there may have been an incident with two de-watering 12 inch PVC pipes that were installed on either side of the USTs . . . .
>
> During the excavation of the USTs, the presence of gasoline hydrocarbons was observed throughout the UST excavation area . . . .
>
> The USTs were examined following removal from the excavation.  Both USTs were in excellent condition.
>
> During the UST decommissioning, two vertical PVC pipe were observed in the excavation protruding out the UST excavation.  CETI was not told the purpose or nature of these PVC pipes, however through discussions with persons in the UST industry, CETI found out that pipes not unlike these area commonly used for dewatering the excavation prior to removal of USTs.  CETI did not inspect these PVC pipes prior to the UST decommissioning and on site personal did not no the nature or purpose of these PVC pipes.

(CETI Report, Adams Decl. at 12-13, *passim*, errors in original.)

On January 28, 2000, Plaintiffs filed a claim regarding the contamination with Defendant.  Defendant responded on August 9, 2000, denying coverage on the grounds that because "the contamination was a result of the distributor dumping 4,000 gallons of gasoline down your monitoring well, there would be no coverage under the policy for the cleanup of this contamination since a monitoring well is not part of the storage tank system as described under the policy."  (Land Decl. Ex. 6,

ORDER – 3

Aug. 6, 2000 Denial Letter, at Colony-0280.)

Despite this initial denial of coverage, Defendant remained involved in Plaintiffs' investigation of the incident. In a letter dated July 31, 2001, Defendant wrote:

> [W]e have reached the decision that while there does not appear to be coverage; the allegations by Nelson and Federated [that the UST tightness test may have been faulty and that a pressure switch could have failed causing gasoline to be forced into the basin of the storage tank system] create an issue of fact and if correct could mean our insurance applies. Because of this we are willing to pay for the cost to investigate the cause and scope of the damage with the understanding that by so doing neither we nor Modern Sewer are waiving rights to contest whether or not the policy covers clean up and other corrective action costs if the environmental damage was the result of the misdelivery of the gasoline.

(Land Decl. Ex. 11, July 31, 2001 Colony Letter.) However, the additional investigation did not dislodge Defendant's belief that the incident was not one covered by the policy issued to Plaintiffs and Defendant continued to deny coverage.

Plaintiffs filed this complaint in March 2003, asserting that Defendant has breached its contract in refusing to defend or indemnify Plaintiffs with respect to the costs associated with Plaintiffs' action against Nelson Distributing for recovery of clean-up costs and Plaintiffs' negotiation with the state regarding the Voluntary Cleanup Program, as well as actual investigation and remediation costs. Plaintiffs also allege that Defendant has acted in bad faith by failing "to make payments, under its duty to defend, for costs reasonably occurred in the investigation to determine the source of contamination, the type of contamination, and the extent of the contamination." (Compl. ¶ 79.)

III. ANALYSIS

    A. *Plaintiffs' contentions regarding Defendant's documentation*

Plaintiffs move to strike the Adams Declaration, submitted in support of Defendant's motion for summary judgment, as inadmissible because it is not an affidavit made under oath and notarized by a notary public and because it is not made upon personal knowledge. This motion has no basis in law or fact. Aside from the express language of 28 U.S.C. § 1746 permitting un-notarized declarations when dated and subscribed to by the declarant as true and under penalty of perjury, the Court notes that

ORDER – 4

Plaintiffs themselves submitted an un-notarized declaration by Mr. Land. Here, Mr. Adams properly subscribed to his declaration. In addition, Plaintiffs make no offer of evidence with respect to their contention that Mr. Adams lacks personal knowledge of the documents and exhibits submitted. Indeed, Defendant states that Mr. Adams was involved in producing the very documents at issue to Plaintiffs during the course of discovery in this matter.

Plaintiffs also argue that the Court should not consider Defendant's exhibits because they failed to file originals and because they are inadequately authenticated. These objections are not well taken. The Court notes that many of the documents submitted by Defendant were also submitted by Plaintiffs. In addition, the Federal Rules of Evidence permit photocopies to be admitted except in certain limited circumstances not applicable in this case. FED. R. EVID. 1003. Given these circumstances, the Court finds that Defendant's exhibits are admissible as reliable, relevant documents.

For these reasons, Plaintiffs' motion to strike the Adams Declaration and the attached exhibits is DENIED.

### B. Applicable standard for summary judgment motions

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions and provides in relevant part that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

ORDER – 5

In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Fed. R. Civ. P. 56(f) provides, in relevant part, that

> [s]hould it appear from the affidavits of a party opposing [a summary judgment motion] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court . . . may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.

The Ninth Circuit has further clarified how this rule should operate: "To prevail under this Rule, parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (2004) (citing *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986). In addition, "[t]he burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence exists, and that it would preclude summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

C.   *Plaintiffs' Rule 56(f) motion for continuance*

Plaintiffs' motion for a continuance, the necessity for which was triggered by the filing of Defendant's motion for summary judgment, stated that because Plaintiffs' theory of the case was that the insurance policy "provides coverage . . . for third party liability stemming from the off-site migration of contaminants from the subject property onto an adjacent property . . . it will be necessary to establish that in fact the contaminants have migrated from the subject property and onto an adjacent parcel owned by a third party." (Pls.' Mot. 56(f) Contin. at 2.) Plaintiffs requested a continuance so that Sound Environmental Strategies, an outside consultant, could perform additional groundwater and soil sampling. In essence, Plaintiffs' motion is based on the contention that additional discovery and investigation could lead to evidence pertinent to a genuine issue of material fact that would preclude summary judgment.

ORDER – 6

1  However, because interpretation of an insurance policy is a question of law, rather than of fact, *Berg v.
2  Hudesman*, 801 P.2d 222, 226-27 (Wash. 1990), Plaintiffs' attempt to garner more facts is irrelevant to
3  the questions raised by the complaint and Defendant's motion for summary judgment.

4  The essential dispute between the parties is whether Nelson's mis-delivery of the gasoline into the
5  PVC pipe and the subsequent flow of gasoline into the ground constitutes a covered "release."  Rather
6  than addressing this issue of law, Plaintiffs' proposed additional investigation assumes that their legal
7  theory of the case (*i.e.*, their interpretation of the insurance policy) is correct and seeks to establish that a
8  covered "release" exists.  Even if Plaintiffs' investigation confirms that "the contaminants have migrated
9  from the subject property and onto an adjacent parcel owned by a third party," this would not preclude
10 summary judgment in favor of the Defendant if the "migration" does not constitute a covered "release."
11 For this reason, the Court finds that Plaintiffs have failed to sustain their burden on their Rule 56(f)
12 motion.  This motion is therefore DENIED.

   *D.   Construction of insurance policy*

   *1.   Defendant's duty to defend and indemnify*

15  In construing the language of an insurance policy, a court must construe the entire contract
16 together so as to give force and effect to each clause.  *Am. Star Ins. Co. v. Grice,* 854 P.2d 622, 625
17 (Wash. 1993).  If the language of an insurance contract is clear and unambiguous, the court must enforce
18 it as written and may not modify it or create ambiguity where none exists.  *Pub. Util. Dist. No. 1 of
19 Klickitat County v. Int'l Ins. Co.*, 881 P.2d 1020, 1025 (Wash. 1994).  A policy provision is ambiguous
20 only when it is fairly susceptible to two different and reasonable interpretations.  *McDonald v. State Farm
21 Fire and Cas. Co.*, 837 P.2d 1000, 1004 (Wash. 1992).

22  In the case at bar, Plaintiffs rely on language in the policy broadly stating that Defendant's liability
23 under the contract would be triggered "by a Release of a Petroleum Product from a Scheduled Facility"
24 (*see* Policy ¶ I(A)) to argue that "migration" of contaminants from Plaintiffs' property to an adjacent
25 third-party-owned property would be a covered incident.  The parties agree that Plaintiffs' property is a

ORDER – 7

"Scheduled Facility." If there were no other qualifications as to any of the key terms in Plaintiffs' quoted language, Plaintiffs' interpretation could be correct. However, the policy quite clearly states in the "Definitions" section that "release" is used only to mean those releases from a storage tank system at a scheduled facility (*Id.* ¶ III(H)), and further clarifies that "storage tank system" means "[a]n underground storage tank or combination of tanks and associated piping, including any associated dispenser[s]." (*Id.* ¶ III(L).) If the policy were to be construed as Plaintiffs urge, these specific definitions of "release" and "storage tank system" would be rendered utterly superfluous. Washington law prohibits such a result. *See Am. Star Ins. Co.,* 854 P.2d at 625.

Plaintiffs also cite to the second half of the definition of "release" as support for their proposed interpretation. This part states that "[s]ingle and intermittent episodes and continuous spilling, leaking, emitting, discharging, escaping, or leaching from the same Scheduled Facility shall be considered a single Release at the time such Release first commences." According to Plaintiffs, "this language makes clear that a Release takes place if a petroleum product is emitted 'from' the Scheduled Facility." (Pls.' Opp'n to Def.'s Summ. J. at 12.) However, Plaintiffs' de-contextualized reading of this sentence renders the first sentence's reference to "storage tank system" meaningless. Construed together with the first sentence, as required by *American Star Insurance Company*, it is quite clear that the second sentence merely clarifies how "releases" as defined by the first sentence are to be counted, rather than changing the basic definition of "release".

For the foregoing reasons, the Court finds that Defendant's duties to defend and indemnify are triggered only by a release of petroleum product from a storage tank system.

   2.   *Storage tank systems*

Plaintiffs maintain that even if "release" is construed to mean only release from a storage tank system, the alleged Nelson Distributing mis-delivery into the PVC tube and ensuing seepage into the ground around the storage tank constitutes such a covered release because the PVC tube was a "monitoring well" that should be considered part of the covered storage tank system. Assuming,

ORDER – 8

*arguendo*, that the PVC pipe in question was, in fact, a "monitoring well" (a characterization on which the parties disagree), the Court must first determine whether "monitoring wells" are part of the storage tank systems covered by the Colony policy issued to Modern Sewer.

The plain language of the definition of "storage tank system" states that "Storage Tank System means [a]n underground storage tank or combination of tanks and associated piping, including any attached dispenser(s), that is used to contain an accumulation of regulated substances." Thus, the issue is whether this definition of "storage tank system" includes "monitoring wells."

Where the language of an insurance policy is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. *Pub. Util. Dist. No. 1 of Klickitat County*, 881 P.2d at 1025. Here, the policy's definition specifies that a storage tank system is a unit used to contain an accumulation of substances. The "unit" is further defined as including the tank itself and "associated piping." The Court does not find that this policy language is ambiguous. It is clear that the crucial element of the definition is the qualifier clause requiring that the unit contain substances. As Plaintiffs do not argue that their "monitoring wells" "contained" substances, nor does it appear from the record that they actually did,[2] the Court does not find that the PVC pipe in question was part of the storage tank system.

Plaintiffs cite to provisions of the Washington Administrative Code that they believe support their argument that "monitoring wells" must be included in the insurance policy's definition of "storage tank system." However, the Administrative Code is irrelevant to the Court's analysis because the policy's language was not ambiguous, and thus did not require reference to external sources of information for interpretive purposes.

---

[2](*See, e.g.*, Adams Decl. at 20, Stone Dep. at 10:12-15, stating, "And that's when it began to sink in that he put it in the plastic stand pipe that goes down into the pea gravel instead of into the fuel tank;" Compl. ¶ 17, alleging "Mr. Williams . . . pumped the 2,000 gallons into the observation well and subsequently into the groundwater of the State of Washington".)

ORDER – 9

Even if the Code were relevant, the Code does not support Plaintiffs' urged interpretation. Chapter 173-360, covering underground storage tank regulations, does require that all underground storage tanks be equipped with a leak detection system. WASH. ADMIN. CODE § 173.360.335. The Code also allows these leak detection systems to take the form of a monitoring well, § 173.360.345. However, the definitions section of the chapter quite clearly defines "UST system" or "tank system" as "an underground storage tank, connected underground piping, underground ancillary equipment, and containment system, if any." § 173.360.120. The section also defines "ancillary equipment" as "any devices . . . used to distribute, meter, or control the flow of regulated substances to and from an UST." Although Plaintiffs might argue that a monitoring well whose purpose was to serve as a leak detection system could technically be considered "ancillary equipment" because of its function to "meter" the "flow" from a UST, a common sense reading of the code provisions does not permit this interpretation. The Court also notes, with respect to this remotely possible interpretation, that although the chapter does not define "flow," it does define "release" in substantially the same terms as the Colony-issued insurance policy. § 173.360.120. For this reason, the Court is disinclined to read "ancillary equipment" to include "monitoring wells," which, properly speaking, "meter" or "measure" "releases" rather than "flows."

For all the foregoing reasons, the Court does not find that the PVC pipe at issue, even if considered a "monitoring well," constitutes part of the covered "storage tank system." Therefore, any release determined to have originated from the "monitoring well" does not trigger Defendant's duties under the insurance policy.

E.   *Factual determinations with respect to the "release"*

The Court does not find that there remains any genuine issue of material fact with respect to the origin of the contaminants at issue in this case. A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248. The record now before the Court contains substantial evidence that the contamination originated from the alleged mis-delivery of fuel in 1998. The record includes tank tightness test results indicating

ORDER – 10

that the tanks were in good working order when they were removed in 2000.[3] (*See, e.g.*, Adams Decl. at 21, "Certificate of Tightness.") Although Plaintiffs decline to commit themselves in this action to the position that Nelson Distributing mis-delivered the gasoline, or that this alleged mis-delivery resulted in the contamination at issue, Plaintiffs are currently engaged in litigating this very issue, taking these very positions, against Nelson Distributing. *Modern Sewer v. Nelson Distrib.*, No. 03-2-06691-3 (Snohomish County Superior Ct. filed Mar. 31, 2003). Given these factors, the Court does not find that there is sufficient evidence for a reasonable fact-finder to find that the contamination did not occur as a result of the 1998 delivery incident. Plaintiffs have failed to sustain their burden of making more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis*, 26 F.3d at 890.

For these reasons, and because of the Court's conclusions of law with respect to interpretation of Colony's insurance policy, the Court finds that Defendant is entitled to judgment as a matter of law with respect to its duties to defend and indemnify Plaintiffs.

*F.   Bad faith*

Plaintiffs' bad faith cause of action is asserted pursuant to the Washington Consumer Protection Act. WASH. REV. CODE § 19.98.020. "To succeed on a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003). Here, Plaintiffs' claim fails as a matter of law because Defendant did not breach its insurance contract. Therefore, Defendant is entitled to judgment as a matter of law with respect to Plaintiffs' claim for bad faith.

For all the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

IV.   CONCLUSION

---

[3] Although Nelson Distributing and its insurance carrier disputed the accuracy and reliability of the tank tightness tests done upon decommissioning of the tanks, the issues raised were resolved by subsequent tests and clarifications.

ORDER – 11

In accordance with the foregoing, Plaintiffs' motion for a Rule 56(f) continuance is DENIED, and Defendant's motion for summary judgment is GRANTED. Plaintiffs' complaint is hereby DISMISSED with prejudice.

The Clerk is directed to enter judgment accordingly.

SO ORDERED this 9th day of August, 2005.

/s/ John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 12